Campbell, Special J.,
 

 delivered the opinion of the court.
 

 W. R. Hunt and Giles L. Driver, executors of Eli M. Driver, filed their bill in the Chancery Court at Memphis against Wing, Cox & Co., White & Billingsly, and J. N. Pettit & Co., alleging that they rented to the defendants, Wing, Cox
 
 &
 
 Co., a plantation in Tunica county, Mississippi, known as the the “ Driver Plantation ” and took from them a note for $4,000, dated January 1st, 1867, payable to W. R. Hunt, executor, on the first day of October, 1867. On the 15th day of January, 1867, they entered into a contract and agreement which was recorded in the office of the Probate Clerk of Tunica county on the 19th of January thereafter. ■
 

 This contract and agreement stipulated that Wing, Cox
 
 &
 
 Co. were to pay $4,000 for the rent of the place, and retained an express lien on all the cotton
 
 *141
 
 and corn raised on the place for that year, and a specific lien upon the horses, mules and farming implements, etc., to secure the payment of the $4,000, as well as other rents provided for in said lease. That after that time Wing, Cox
 
 &
 
 Co. executed a mortgage to the defendants, White & Billingsly, on the same property, which was also recorded in said county of Tunica, and State of Mississippi. That the defendants, Wing, Cox
 
 &
 
 Co., failed to pay the $4,000 at maturity, when complainants, under the laws of Mississippi, sued out a distress warrant for the rent, under which the sheriff of Tunica county seized the cotton and corn, together with the mules, horses and farming implements, and, in November, 1867, sold all of the property so seized except twenty-four bales of cotton, and ■ paid the proceeds to complainants, who credited the same on the $4,000 rent note. That the twenty-four bales of cotton were taken out of the hands of the sheriff by the agent of the Freedmen’s Bureau in said county of Tunica for the purpose of paying the wages alleged by the agent to be due by Wing, Cox
 
 &
 
 Co. to the negro employes for work done on the plantation.
 

 The cotton was shipped by the agent, consigned to Barrington
 
 &
 
 Howell, cotton factors, in the city of Memphis. Upon the arrival of it in Memphis, White
 
 &
 
 Billingsly, claiming under their mortgage, sued out a writ of replevin from the Law Court of the city of Memphis, and took possession of the cotton before it reached the possession of Farrington & Howell and had it turned over to the defendants, J. N. Pettit &
 
 *142
 
 Co., who soon afterward sold it for about $1,200.
 

 The bill charges that there is still due and unpaid upon the rent note about $675, and that White & Bil-lingsly had both actual and constructive notice of their lien. The bill prayed for writs of attachment and injunction which were issued as prayed. This bill was filed on the 19th of November, 1867.
 

 Afterward, on the 17th day of April, 1868, Sylvia Brooks and some thirty-eight or nine others, free persons of color, all of Tunica county, Mississippi, who sue by their next friend, M. J. Manning, agent of the Bureau of Befugees Freedmen and Abandoned Lands, filed their bill in the Chancery Court of Memphis, alleging that in the year 1867 they worked as hands and laborers in making a crop on what is known as the Driver Plantation in Tunica county, Mississippi, under a contract with Wing, Cox
 
 &
 
 Co., who were non-residents of the State of Tennessee, and were insolvent; that they could only collect the amount due for their services in making it out of the crop itself. That Wing, Cox & Co. rented the plantation from Hunt and Driver, executors, who claim that they have a lien on said crop for the payment of the $4,000 note, also on the mules, horses, farming implements, etc., placed upon the plantation by Wing, Cox
 
 &
 
 Co., but state that they are ignorant of the validity of the lien and reserve the right to contest the same. But that if the claim of Hunt and Driver, executors, shall turn out to be well founded, they are advised that such lien cannot interfere with their rights and equities. That White
 
 &
 
 Billingsly claim to have a mortgage upon the same
 
 *143
 
 property, but they know nothing of the validity of it, nor the extent of the indebtedness secured by it, and reserve the right to show that the mortgage is invalid, and if there be any such valid mortgage it cannot affect their rights and equities. That Hunt and Driver, by some kind of proceeding sired out in the State of Mississippi, seized all the cotton and corn raised on the place, and all of the horses, mules, farming implements, etc., and caused all to be sold except twenty-four bales of cotton, and had the §4,000 note credited with the proceeds of the sale, and if the note was not entirely paid it may be reduced down to about §600. That the twenty-four bales being part of the crop raised on the plantation in the year 1867, by the services and labor of the complainants, were taken out of the possession of the sheriff having the same in charge by their next freind, M. J. Manning, agent of the Bureau of Refugees, Freedmen and Abandoned Lands, for the purpose of paying and settling with complainants for their services and labor in making said crop. That Manning shipped the cotton to Memphis, consigned to Farring-ton & Howell, cotton factors, with instructions to sell the same. The bill also alleges that a portion of the freedmen worked for wages and some of them for an interest in the crop, and they charge that even if Hunt and Driver, and White & Billingsly have valid mortgages upon said crop, that they having by their labor produced the crop, have superior equities to the mortgagees.
 

 They pray that they be allowed to intervene and become parties to the suit pending in the Memphis
 
 *144
 
 Chancery Court between Hunt and Driver, and Wing, Cox & Co., and others. That J. N. Pettit & Co. he charged and notified to hold the proceeds of the twenty-four bales of cotton until they can be heard, and that their claims be paid out of the proceeds of the cotton to the exclusion of Hunt and Driver and White
 
 &
 
 Billingsly.
 

 To this bill both parties demurred. The demurrers were overruled and the defendants appealed to this court.
 

 The Freedmen’s bill is designated as a “Bill of Intervenor,” a proceeding not known to the
 
 nomenclature
 
 of a court of chancery. But as a court of equity looks to the substance and not to the names of things, a party will never be repelled merely because he designates his pleadings by unusual names. We are to see if the court has jurisdiction of the persons and of the subject matter, and if the proceeding conforms to the course of equitable procedure, to established rules of pleading and practice, and the allegations develop a case of equitable cognizance, and the party invoking the aid of the court is entitled to the relief prayed for, the same must be retained. A bill framed as a bill of interpleader would be none the less a bill of interpleader because the draftsman or the pleader chose to call it a bill for discovery, or a bill for a specific performance. If, then, the bill in this cause contains allegations showing that the parties have rights which require the interposition of the court to assert or protect, and the proceeding has been instituted in conformity to the settled rules of plead
 
 *145
 
 ing and practice, then it must be retained and the decree rendered so as to give the proper relief, and adjust the equities between the parties.
 

 The first objection urged against the bill is, that it is filed by some thirty^five or forty persons who sue by their next friend, when it is shown upon its face that a large portion of them are
 
 sui juris,
 
 and there is no allegation that any of them are under disability.
 

 It is true that when persons are incapable of acting for themselves, although not strictly either idiots or lunatics, a suit may be brought in their name, and the court will authorize some. suitable person to carry it on as next friend. But in any such cases it is in the discretion of the court to allow the suit to proceed or not. Story, Eq. PL, Sec. 6-8. But' we can find neither precedent nor authority for allowing a person under no incapacity whatever to sue by next friend.
 

 The rule allowing persons under disability to sue by a next friend grows out of the necessity of the case. Infants, idiots and lunatics are supposed to be incapable of knowing their rights, and consequently unable to assert them. A married woman is under the dominion and control of her husband, and when her rights are in conflict with his, she being disabled to sue in her own name, can only obtain redress through her next friend. Another reason is that courts of chancery act
 
 in personam,
 
 and require that there shall be some person before the court answerable for costs. Anciently when a party exhibited a bill
 
 *146
 
 as the next friend of a person under disability, he was required to produce with the bill his authority for doing so; but the modern practice is to retain the bill unless the defendant requires the production of the authority from the next friend. This shows that a person cannot as a matter of common right, institute suit as next friend, and the right to do so being exceptional, good pleading requires that it should appear on the face of the bill that the case is within the rule.
 

 We know that the complainants, Sylvia Brooks, and others, belong to a race which have but recently been emancipated from slavery; that as a race they are far below the white man in intelligence, but we also know that by law they are under no disability to sue, and have all the rights, before the courts of the country, possessed by any other class of citizens. ■ Yet their want of intelligence, and their ignorance of the complicated relations of business life, appeal with great potency to a court of chancery to relax its rules; and if it is possible to retain the bill, particularly after it has reached this court where no amendments are allowed, we would hesitate long to dismiss a bill for this reason, if it stated a case which showed that the parties had rights which required the interposition of the court for protection.
 

 The equity relied upon by the freedmen complainants is that as laborers upon the Driver Plantation they have a superior equity to have satisfaction of their demands out of the twenty-four bales of cotton, and are entitled to be first paid for their services out
 
 *147
 
 of the proceeds of the sale of it; that their equity is superior to the lien of the mortgagees even though the mortgage may have been executed prior to their employment as laborers. This doctrine is entirely new and unknown to a court of chancery, and if it has any foundation whatever we have failed to discover it.
 

 The right of the owner of the soil to obtain compensation for the use of his land has always been favored both in this country and in England. In the latter country, and in perhaps some of the States where the common law has not been changed by statute, the landlord can collect his rent by the summary method of distress. If the tenant is in arrears he may enter upon the land without process and drive off his tenant’s cattle, remove his furniture, and strip him of everything he has. He may enter not only upon the land for which the rent is due, but he may distrain for rent upon another and different tract of land. In most of the States of this country the rule has been changed by giving a lien upon the crop raised upon the land to secure the rent — abolishing the harsh and often oppressive method of the common law. But the right is still a favored one.
 

 The public good requires that owners of the soil should clear their lands and build houses, and by these improvements not only to beautify and adorn the country and add to its material wealth, but td afford larger facilities for the support of the industrial glasses, and the maintenance of a denser population.
 

 That the laborer’s claim for compensation for his labor is a most meritorious one cannot be denied.
 
 *148
 
 But if we should decide that the farm laborer has a lien upon the crop, or is entitled, out of the proceeds of the crop, to be paid for his services to the exclusion of all other demands until he (is paid, it would be
 
 jus dare
 
 not
 
 jus dicere.
 
 The very ingenious argument of the learned counsel who insists that we shall so decide, is more plausible than sound. It is said that without the labor there can be no crop, and if there is no fruit there can be no profit for the landlord or any one else. This is true, but the landlord replied that without his land, which had caused him so much labor, and the expenditure of so much capital to make it fit for cultivation, the laborers would be without a home and without the means of acquiring bread to sustain life, or give him bone and muscle to perform the labor. But we will not undertake to settle the abstract relative merits of the two classes of claims — each is entitled to all the protection the law gives it and no more. It is insisted that by the laws of Mississippi the landlord has no lien upon the crop for rent. Whether the executors have a lien as landlord, or by mortgage on the crop, of by neither, makes no difference, unless the freedmen can show that they, by the laws of Mississippi, or by virtue of some contract, had acquired a lien on the cotton, or by their bill show some right in relation thereto superior to that of the executors and the other defendants. For their bill shows upon its face that this very identical cotton had been seized .under legal process in the State of Mississippi at the suit of the executors, and was taken out of the cus
 
 *149
 
 tody of the law by a proceeding 'unknown to the law. And at the time the bill was filed the executors had fixed a lien upon it by their attachment which can only be displaced by showing a superior equity. Have they done so ?
 

 As to those of them who worked for wages, they certainly have no lien, nor have they any superior equity requiring the interposition of the court. If they had filed their bill as creditors and asked for an attachment of the surplus of the fund, if there was any, the case might have been different. But the bill is filed ■ to assert a superior equity, and the allegations fail to show that they have any.
 

 In relation to those of them who claim that they labored for an interest in the crop, there is more plausibility While those contracts, by which the laborer undertakes to make a crop for a given share of it, do not create a partnership between the parties as was decided by this court in the case of
 
 Mann
 
 v.
 
 Taylor,
 
 at the April term, 1871, not yet reported (since reported, 5 Heis., 267. — Ed.); yet, they are owners in common of the crop. In this connection the bill alleges that Jesse Christian and some four or five others, were to have part of the crop for their services, which interest, they charge was one-third. It cannot be ascertained from the bill that they claim an interest in any specific part of the cotton; they only allege that they were to have part of the crop raised, for their labor and services, and which interest is charged to have been one-third, and do not allege that they have a claim as owners to the specific bales of cotton in controversy, and if
 
 *150
 
 they did, the charge is repugnant to exhibit IT, filed with and made a part of the bill, and to another charge in the bill, that they have the right to have their share in the entire crop taken out of the proceeds of the twenty-four bales.
 

 But the bill alleges that it was drawn by counsel in the absence of the parties, and the person representing them cannot give the information necessary to enable him to make the charges more specific, and reserves the right to make the true facts appear by the proof.
 

 With this uncertainty in the allegation of the bill upon the only point that could give the parties a
 
 status
 
 in court, to say nothing of the unusual mode in which the parties sue, it would be doing great injustice to the parties to the original suit to permit a person to intrude himself into a pending litigation upon such uncertain and inconclusive statements. The language of the intervention statute is “in actions for the recovery of property, any person not a party thereto, on showing himself interested in the subject matter of the court, may be allowed to appear as defendant therein.” Code of Tennessee, § 2,799, and this was the rule in equity before the passage of the statute.
 

 Suppose the bill was allowed to stand as a petition, then does it show that they have an interest in the Subject matter of the suit. If it were competent without affidavit to show the interest of the party, it certainly cannot be sufficient merely to state that it will be made to appear by the proof. Proceedings of this character operate to suspend proceedings in the cause
 
 *151
 
 to which they seek to have themselves made parties, and the allegations should be such as if proven would show the interest of the party, and, the better practice would be, in all cases where the petition states any matter outside of the record, or operates to suspend the proceeding, to verify the petition by affidavit.
 

 We are therefore of the opinion that the freedmen complainants have not, by their bill, shown that they are entitled to the relief prayed for.
 

 The decree of the Chancellor overruling the demurrer will be reversed and dismissed, but without prejudice to such of them as may show in a proper proceeding that they contracted to labor for an interest in the crop, before any valid lien had been made upon it, and that the cotton in controversy, or any part of it, was the fruit of their labor.
 

 The next friend of the freedmen complainants will be required to pay the costs of this court and of the* court below.